TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-10-00536-CR






The State of Texas, Appellant


v.


Wayne Denton Dickerson, Appellee






FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT

NO. CR2008-397, THE HONORABLE RONALD G. CARR, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 Appellee Wayne Dickerson was charged with two counts of aggravated sexual assault
of a child. See Tex. Penal Code Ann. § 22.021 (West Supp. 2011). Prior to trial, Dickerson filed
a motion to suppress the oral and written statements he made to a detective during the investigation. 
After conducting a hearing on the motion, the trial court suppressed the statements on the ground that
Dickerson was in custody at the time the statements were made and the detective failed to provide
his Miranda or Article 38.23 warnings. See Miranda v. Arizona, 384 U.S. 436 (1966); Tex. Code
Crim. Proc. Ann. art. 38.22, § 2(a) (West 2005). On appeal, the State contends that the trial court
abused its discretion in granting the motion to suppress. We reverse the trial court's order
suppressing the statements and remand for further proceedings.



BACKGROUND

 The testimony and evidence presented at the suppression hearing reflect that Comal
County Deputy Mike Smith was dispatched to the Cowboys for Jesus Church on May 13, 2008, for
a report of possible child abuse. (1) Michael Reed reported that one of his students, A.W., told him that
her stepfather was abusing her seven-year-old sister. Reed told the deputy that he contacted A.W.'s
grandmother, Deena Lindell, (2) who told him that her daughter, Jennifer Dickerson, had told her that
Dickerson had performed oral sex on their daughter, C.D., a long time ago. After talking to Reed,
Deputy Smith contacted Lindell, who reported the same information to him--that approximately
one month ago her daughter had called her crying and told her that she remembered waking up one
night when C.D. was sleeping with her and Dickerson and she saw Dickerson performing oral sex
on C.D.

 The deputy then spoke with A.W., who disclosed physical abuse by Dickerson and
expressed concerns that Dickerson was physically and sexually abusing her sister, C.D. According
to A.W., several months ago she saw a bruise on C.D.'s leg and, when she asked her about it, C.D.
told her that Dickerson had pinched her. A.W. told Deputy Smith that she saw C.D. the previous
Saturday and asked her if Dickerson had touched her anywhere that was bad, whereupon C.D. told
her that she and her dad "had secrets." A.W. told the deputy that C.D. has been living with her father
since her mother and Dickerson were going through the divorce. She told Deputy Smith that she was
afraid Dickerson was hurting her sister.

 After obtaining written statements from Reed, A.W., and Lindell, Deputy Smith
contacted Detective Jason Nitsch, the on-call detective. Deputy Smith then contacted
Jennifer Dickerson, A.W. and C.D.'s mother, who related the incident of waking up and seeing
Dickerson performing oral sex on C.D. She indicated that she could not remember the date of the
incident but believed C.D. was two or three years old.

 Deputy Smith then contacted CPS to advise the department of the situation and was
advised that CPS wanted C.D. removed from Dickerson's home pending a CPS investigation and
asked the deputy to find a family member with whom C.D. could be placed. After Detective Nitsch
arrived, the officers met at a nearby restaurant parking lot to determine how to proceed. As it was
time for a shift change, Deputy Smith and his partner were dismissed. Nitsch, his sergeant, and two
midnight-shift deputies proceeded to Dickerson's residence to make contact with Dickerson and
remove C.D. from the residence pending investigation in accordance with a CPS "safety plan."

 At the hearing on the motion to suppress, Nitsch testified that he made contact with
Dickerson at his residence at approximately midnight on May 13, 2008. Nitsch indicated that his
sergeant advised Dickerson that they were there concerning allegations regarding his daughter, C.D.,
and requested that, pursuant to the CPS "safety plan," C.D. be temporarily placed with a family
member. Nitsch testified that Dickerson agreed to a voluntary removal placing C.D. with his mother. 
Dickerson contacted his mother, who arrived shortly thereafter with her husband and signed the
safety plan indicating she would care for C.D. until notified by CPS or law enforcement. According
to the detective's testimony, once C.D. left with Dickerson's mother, Dickerson agreed to follow
Nitsch to the Comal County Sheriff's Office so the detective could interview him and obtain a
voluntary statement.

 Nitsch testified that Dickerson drove his own truck, following him 20-25 miles to the
sheriff's office. He took Dickerson to his office, set up the video camera, and told Dickerson he was
going to record the interview. Nitsch sat behind his desk while Dickerson sat next to the open door. (3) 
He testified that he did not give Dickerson the Miranda warnings or the Article 38.22 warnings prior
to the interview or the taking of the written statement because, in his view, Dickerson was not in
custody. (4) The detective also testified that he knew he was not going to take Dickerson into custody
because this was something that had happened several years ago and he knew that the child had been
removed from the house with the safety plan intact, so the threat was gone. At that point, Nitsch
explained, he was simply conducting an investigation. The video of the interview reflects that Nitsch
immediately informed Dickerson he was not under arrest and was free to leave at any time. After
initial statements related to identification and establishing the date and time, the interview proceeded
as follows:


 Detective Nitsch: And how did you get here?

 

 Dickerson: I drove my personal truck.

 

 Detective Nitsch: And you understand that you are here of your own free will?

 

 Dickerson: Yes.

 

 Detective Nitsch: And you are going to leave the same way you came in.

 

 Dickerson: Yeah.

 

 Detective Nitsch: You can go out the same door you came in and the bathrooms
are on the left when you came in?

 

 Dickerson: Right.

 

 Detective Nitsch: Let me set something up. We talked before at your house and
you kind of know everything that is going on so we would
like to just kind of clarify some things so we can hurry up and
get this issue resolved.

 

 Dickerson: Yeah, you ain't kidding.

 

 Detective Nitsch: You understand that you are not under arrest?

 

 Dickerson: Right.

 

 Detective Nitsch: And you are free to leave any time. If for some reason during
the interview you decide that you don't want to talk any more
all you have to do is tell me, you know, and you can get up
and leave. You are not required.

 

 Dickerson: Yeah, I have nothing to hide, I haven't done anything.

 

 At first, Dickerson denied any abuse of C.D., explaining that the abuse allegations
were a "set up" by Jennifer's family. However, as the interview progressed, when Nitsch provided
details of the allegation of oral sex, Dickerson "clicked" on what the allegations were. He indicated
that the incident did happen a long time ago. He explained to the detective that he was asleep, did
not know his daughter was in bed with them, and thought he was performing oral sex on his wife
until his wife hit him, "waking" him up. The interview lasted approximately 50 minutes. At the
conclusion of the interview, Nitsch discussed Dickerson's providing a written statement, explaining
to Dickerson that it was his opportunity to put down on paper "what happened, why it happened, and
how it happened." Dickerson then requested a restroom break. He went--unescorted--to the
restroom and then went to smoke outside. The smoke break lasted 20-30 minutes, during which time
Dickerson was alone outside and made several calls on his cell phone to Jennifer Dickerson. After
the smoke break, Nitsch sat with Dickerson at a table in the break room while he provided a written
statement. (5) After completing the written statement, Nitsch and Dickerson returned to the detective's
office to conclude the video recording. Dickerson then left the sheriff's office in his own truck. 
Nitche testified that after interviewing Dickerson, he continued his investigation. He never arrested
Dickerson, nor did he obtain an arrest warrant. Instead, after completing his investigation he
submitted the case to the district attorney's office for review.

 On cross-examination, Nitsch testified that he advised Dickerson numerous times that
he was free to leave, but conceded that he did not ask Dickerson if he "felt" that he was free to leave. 
He testified that when Dickerson was outside smoking, he checked on him several times, through
a window, to make sure he was still there because "[i]f he got in his truck and drove off, I wasn't
going to sit around there all night. I would have gone home." In response to defense counsel's
questions, he stated that if Dickerson had left, he would not have gone after him and would not have
charged him with escape. The detective agreed that he had probable cause to arrest Dickerson after
he admitted that he had performed oral sex on C.D.

 Dickerson also testified at the suppression hearing. He testified that Detective
Nitsch's testimony was true "to a certain extent." He stated that when the deputies came to his
house, he felt "very uncomfortable" and thought he was going to jail. He indicated that the deputies
told him to follow them to the sheriff's office--rather than asking if he would--and he felt like he
had to go. (6) He stated that he executed the written statement because he was told to and did not think
he had a choice. He testified that originally at his home, when the officers discussed C.D. going with
Lindell, he objected and told them he did not want his daughter to go with his mother-in-law. 
Instead, he wanted his daughter to go with his mother. Dickerson confirmed that the officers
accommodated him and allowed him to call his mother to come get C.D.

 In his testimony, Dickerson stated that he drove down to the Comal County Sheriff's
Office in his own truck. He acknowledged that he was never placed in a patrol car or placed in
handcuffs or any type of restraint. He agreed that the detective informed him at the beginning of the
interview that he was not under arrest and was free to leave at any time. He also agreed that on the
video he expressed his understanding of those facts. However, he testified that he was being
sarcastic when he said "yeah" after being told he was free to leave at any time. He testified that
during the videotaped interview, he felt like he had to be there. He stated that on arrival at the CID
building, everything was locked--that the detective had to unlock the gate to allow them to pass
through as well as unlock the door to the building. He testified that he thought he was in custody
because "they took my daughter and were taking me out of my house, too." On re-direct, Dickerson
also testified that he was in special education classes throughout his schooling and had to be put in
private schools to avoid the danger of being held back.

 On cross-examination, Dickerson confirmed that he had his cell phone with him
throughout the interview process. He testified that he made several phone calls while he was driving
to the sheriff's office as well as while he was outside during his smoke break. He stated that he
thought he might be arrested after his statement to Detective Nitsch, but confirmed that he was told
from the beginning that he could leave whenever he wanted, and did in fact leave in his own vehicle
after writing out his statement after the interview.

 No other witnesses testified at the hearing. After argument from both parties, the trial
court summarily granted Dickerson's motion. In subsequent findings of fact and conclusions of law,
the court found that Dickerson was the subject of a custodial interrogation and concluded that the
failure to comply with Miranda and Article 38.22 rendered the statements inadmissible.

 The State appeals the suppression of Dickerson's oral and written statements,
challenging the trial court's findings and conclusions.


STANDARD OF REVIEW

 We review a trial court's ruling on a motion to suppress evidence for abuse of
discretion. Crain v. State, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). We review the record to
determine whether the trial court's ruling is supported by the record and is correct under some theory
of law applicable to the case. St. George v. State, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). 
A trial court abuses its discretion when its ruling is arbitrary or unreasonable. State v. Mechler,
153 S.W.3d 435, 439 (Tex. Crim. App. 2005).

 In reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated
standard of review. Wilson v. State, 311 S.W.3d 452, 457-58 (Tex. Crim. App. 2010); Carmouche
v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). Although we give almost total deference to
the trial court's determination of historical facts, we conduct a de novo review of the trial court's
application of the law to those facts. Wilson, 311 S.W.3d at 458; Carmouche, 10 S.W.3d at 327. 
When a trial court makes explicit fact findings, as it did here, we determine whether the evidence,
when viewed in the light most favorable to the trial court's ruling, supports these fact findings. State
v. Kelly, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006); Figueroa v. State, 250 S.W.3d 490, 508
(Tex. App.--Austin 2008, pet. ref'd).

 The trial judge is the sole trier of fact and exclusive judge of credibility of the
witnesses and the weight to be given to their testimony. St. George, 237 S.W.3d at 725; Guzman
v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). Unless the trial court abuses its discretion by
making a finding unsupported by the record, we defer to the trial court's findings of fact and will not
disturb them on appeal. Miller v. State, 335 S.W.3d 847, 854 (Tex. App.--Austin 2011, no pet.);
see State v. Johnson, 336 S.W.3d 649, 657 (Tex. Crim. App. 2011); Guzman, 955 S.W.2d at 89. We
also afford almost total deference to the trial judge's rulings on mixed questions of law and fact
when the resolution of those questions depends on an evaluation of credibility and demeanor. 
Johnson, 336 S.W.3d at 657; Guzman, 955 S.W.2d at 89. We review de novo mixed questions of
law and fact that do not depend on an evaluation of credibility and demeanor. Johnson, 336 S.W.3d
at 657; Guzman, 955 S.W.2d at 89. All purely legal questions are reviewed de novo. Johnson,
336 S.W.3d at 657; Kothe v. State, 152 S.W.3d 54, 62-63 (Tex. Crim. App. 2004).


DISCUSSION

 In its fourth point of error, the State argues that the trial court abused its discretion
by finding that Dickerson was subjected to custodial interrogation based on Dickerson's subjective
beliefs. We agree that the record does not support the trial court's determination that Dickerson's
oral and written statements were the product of custodial interrogation.


Custodial Interrogation

 Detective Nitsch did not read Dickerson his statutory or Miranda rights. Thus, the
admissibility of his oral and written statements depends on whether he was in custody when he gave
them. (7) Custodial interrogation occurs when law enforcement officers initiate the questioning of a
person who has been taken into custody or otherwise deprived of freedom of action in any significant
way. Miranda, 384 U.S. at 444; see Herrera v. State, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007). 
A person is "in custody" if, under the circumstances, a reasonable person would believe his freedom
of movement was restrained to the degree associated with formal arrest. Dowthitt v. State,
931 S.W.2d 244, 254 (Tex. Crim. App. 1996). The record as a whole must "clearly establish" that
the statement was the product of custodial interrogation. Herrera, 241 S.W.3d at 526 (citing
Wilkerson v. State, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005)). The defendant bears the initial
burden of proving that a statement was the product of a custodial interrogation. Herrera,
241 S.W.3d at 526; see Gardner v. State, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009).

 In determining whether an individual is in custody, we first examine all of the
circumstances surrounding the interrogation to determine if there was a formal arrest or "restraint
of freedom of movement to the degree associated with a formal arrest." Stansbury v. California,
511 U.S. 318, 322 (1994). This determination focuses on the objective circumstances of the
interrogation and not on the subjective views of either the interrogating officers or the person being
questioned. Id. at 323. We next consider whether, in light of the particular circumstances, a
reasonable person would have felt that he was at liberty to terminate the interrogation and leave. 
Thompson v. Keohane, 516 U.S. 99, 112 (1995); Herrera, 241 S.W.3d at 532. The court of criminal
appeals has outlined four general situations that may constitute custody:


 (1) when the suspect is physically deprived of his freedom of action in any significant
way; (2) when a law enforcement officer tells the suspect that he cannot leave;
(3) when law enforcement officers create a situation that would lead a reasonable
person to believe that his freedom of movement has been significantly restricted; and
(4) when there is probable cause to arrest [and the officers' knowledge of probable
cause is communicated to the suspect] and law enforcement officers do not tell the
suspect that he is free to leave.

 

Dowthitt, 931 S.W.2d at 255. These situations will indicate custody if the circumstances would lead
a reasonable person to believe that he is under restraint to the degree associated with an arrest. Id.;
see also California v. Beheler, 463 U.S. 1121, 1125 (1983). Concerning the first three situations,
the restriction on freedom of movement must amount to the degree associated with an arrest as
opposed to an investigative detention. Dowthitt, 931 S.W.2d at 255. Concerning the fourth
situation, the officer's knowledge of probable cause must be manifested to the suspect and does not,
by itself, establish custody. Id.

 A trial court's ultimate custody determination presents a mixed question of law and
fact. Herrera, 241 S.W.3d at 526. Therefore, we afford almost total deference to a trial judge's
custody determination when the questions of historical fact turn on credibility and demeanor. Id. at
526-27 (citing Ripkowski v. State, 61 S.W.3d 378, 381 (Tex. Crim. App. 2001)). Conversely, when
the questions of historical fact do not turn on credibility and demeanor, we review a trial judge's
custody determination de novo. Id. at 527. We examine all of the circumstances surrounding the
interrogation to determine whether a reasonable person in the defendant's position would have felt
he was not at liberty to end the interrogation and leave. Herrera, 241 S.W.3d at 532. Such
circumstances include "the location of the questioning, its duration, statements made during the
interview, the presence or absence of physical restraints during the questioning, and the release of
the interviewee at the end of the questioning." Howes v. Fields, 132 S.Ct. 1181, 1189 (2012)
(internal citations omitted). The ultimate inquiry is simply whether there was a formal arrest or
restraint on freedom of movement of the degree associated with formal arrest. Estrada v. State,
313 S.W.3d 274, 294 (Tex. Crim. App. 2010); see Stansbury, 511 U.S. at 322; Dowthitt, 931 S.W.2d
at 254.


Analysis

 The trial court ultimately concluded that, "[a] careful review of all the pertinent
circumstances in the instant case dictates that the Appellee's [sic] statement resulted from
custodial interrogation. The failure to comply with Miranda, and Article 38.22 rendered the
statement[s] inadmissible." The trial court found that Dickerson was the subject of custodial
interrogation because:

 1) Dickerson was the focus of the investigation; 2) the subjective intent of the police,
as stated by Nitsch in his testimony regarding the restaurant parking lot meeting, was
to obtain statements from Dickerson without complying with article 15.17 or 38.22
or Miranda and its progeny; 3) prior to questioning Dickerson and obtaining
statements from him the police had probable cause to arrest Dickerson; and 4) the
subjective intent of Dickerson, as stated in his sworn testimony during the
suppression hearing, in answering police questions and giving his statements was
governed by his belief that he had no choice other than to submit to questioning and
give his statements and he was unaware of his rights under article 15.17, article 38.22
and Miranda.

 

In its custody determination, however, the trial court failed to focus on the relevant inquiry.

 First, being the "focus" of an investigation does not necessarily render a person "in
custody" for purposes of receiving Miranda warnings or those required under Article 38.22 of the
Code of Criminal Procedure. Gardner, 306 S.W.3d 274, 293; see Beckwith v. United States,
425 U.S. 341, 347 (1976); Meek v. State, 790 S.W.2d 618, 621 (Tex. Crim. App. 1990). The
appropriate inquiry is "whether there is a 'formal arrest or restraint on freedom of movement' of the
degree associated with a formal arrest." Gardner, 306 S.W.3d 274, 293-94; see Herrera,
241 S.W.3d at 525 ("custodial interrogation" is questioning initiated by police officers after person
has been taken into custody or otherwise deprived of freedom in any significant way).

 Second, the custody determination is based entirely on objective circumstances. 
Stansbury, 511 U.S. at 323. The subjective intent of the police is irrelevant except to the extent that
it is manifested in the words or actions of law enforcement officials. Dowthitt, 931 S.W.2d at 254
(citing Stansbury, 511 U.S. at 323). Thus, an


 officer's views concerning the nature of an interrogation, or beliefs concerning the
potential culpability of the individual being questioned, may be one among many
factors that bear upon the assessment whether that individual was in custody, but
only if the officer's views or beliefs were somehow manifested to the individual
under interrogation and would have affected how a reasonable person in that position
would perceive his or her freedom to leave.


Estrada, 313 S.W.3d at 294; see Stansbury, 511 U.S. at 325. Such was not the case here. Moreover,
the trial court's finding concerning subjective intent of police in this case is not supported by the
record. Nothing in Detective Nitsch's testimony--even had the court found the detective not to be
credible--or the offense reports admitted at the hearing supports a finding that the subjective intent
of law enforcement was to subject Dickerson to custodial interrogation but intentionally not provide
him with the statutory or Miranda warnings.

 Third, the officer's knowledge of probable cause must be manifested to the suspect
and does not, by itself, establish custody. Dowthitt, 931 S.W.2d at 255. Rather, a suspect is in
custody if "the manifestation of probable cause, combined with other circumstances, would lead a
reasonable person to believe that he is under restraint to the degree associated with an arrest." Id.

Here, Detective Nitsch expressed in his testimony that he did not necessarily believe he had probable
cause to arrest Dickerson prior to his admission in the interview. Further, while he conceded that
he did have probable cause to arrest after Dickerson admitted to performing oral sex on C.D., he
never manifested that belief to Dickerson. In fact, after Dickerson's admission, Nitsch allowed him
to go to the restroom unaccompanied and to go outside unescorted to smoke. Even after he
had probable cause to arrest Dickerson, the detective never arrested him or even obtained an
arrest warrant.

 Finally, much of the trial court's findings focus on what Dickerson believed or felt
that night: "he felt he had no choice," "D did not believe Nitsch," "D did not believe he was free to
leave," "D did not believe he had any choice," "D believed his freedom was restrained and that he
was, in fact, in custody to the extent D believed he would be arrested as soon as he finished his
statements," "D believed he would be arrested at the conclusion of his statements because his
daughter had been removed from his custody without his consent," (8) and the actions of law
enforcement "creat[ed] in the mind of a special education student the idea he had no choice other
than to accompany them." However, Dickerson's subjective feelings or beliefs, or the feelings or
beliefs of a "special education student" as he purported to be, are not relevant to the custody
determination. This determination focuses on the objective circumstances of the interrogation, not
on the subjective views of either the interrogating officers or the person being questioned. 
Stansbury, 511 U.S. at 323. The relevant inquiry is whether the circumstances would lead a
reasonable person to believe that he is under restraint to the degree associated with formal
arrest--not what Dickerson believed or what a special education student would believe. Under the
circumstances here, a reasonable person would not have believed that he was under restraint to the
degree associated with an arrest.

 Dickerson testified that the deputies told him to come to the sheriff's office. 
Apparently relying on that testimony, the trial court found that Dickerson had been "ordered" by the
deputies to come to the station to give a statement. Dickerson's testimony arguably supports the trial
court's finding. However, while this fact may be a circumstance suggesting custody, the totality of
all the undisputed evidence surrounding Dickerson's interview does not demonstrate the degree of
restraint of freedom associated with a formal arrest. The remaining circumstances do not
support--indeed, they affirmatively negate--a finding that a reasonable person in Dickerson's
position would have felt he was not at liberty to end the interview and leave.

 Dickerson followed Detective Nitsch to the sheriff's office driving in his own truck. 
On the way he made several phone calls on his cell phone. Once at the sheriff's office, the
questioning took place in the detective's office, with the door open. (9) Dickerson acknowledged at
the beginning of the interview that he was there of his own free will. The detective informed
Dickerson that he was not under arrest, was free to leave at any time, could terminate the interview,
and was not required to talk to him. See Fields, 132 S.Ct. at 1193 (singling out communicated
non-custodial status as most important factor in determining that inmate taken from his cell to prison
conference room for questioning about events that occurred outside prison was not "in custody" for
Miranda). Dickerson acknowledged each of these statements with a verbal response.

 The interview was relatively short, just under one hour. Statements made to and
questions asked of Dickerson ranged from friendly to somewhat accusatory. The detective made no
gestures or comments that appeared to be threatening. Dickerson was not handcuffed or physically
restrained. He sat right next to the open office door while the detective sat behind his desk. 
Dickerson would not have had to walk past the detective to leave. At his request, Dickerson was
allowed to go the restroom at the end of the interview, before providing a written statement. He went
to the bathroom unescorted and then went outside to smoke--alone--for 20 to 30 minutes. He had
his cell phone with him, and made multiple phone calls during his smoke break. Finally, after the
interview and after providing a written statement, Dickerson left the sheriff's office in his truck.

 Reviewing all the circumstances surrounding Dickerson's interview, based on
undisputed evidence, we conclude that the record does not support the trial court's determination that
Dickerson was in custody when he provided his oral and written statements. Consequently, we hold
that the trial court erred in concluding that the failure to provide the statutory or Miranda warnings
rendered Dickerson's oral and written statements inadmissible. Dickerson was not in custody. 
Therefore, neither Miranda nor Article 38.22 prohibits the admission of his oral or written
statements. See Miranda, 384 U.S. at 444; Tex. Code Crim. Proc. Ann. art. 38.22, §§ 2, 5 (West
2005). Accordingly, the trial court abused its discretion in suppressing the statements. We sustain
the State's fourth point of error. (10)


CONCLUSION

 We reverse the order of the trial court granting Dickerson's motion to suppress, order
that the motion be denied, and remand the cause to the trial court for further proceedings consistent
with this opinion.


 __________________________________________

 J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Reversed and Remanded

Filed: July 27, 2012

Do Not Publish
1. The facts regarding the initial report of abuse are taken from the offense reports admitted
as defense exhibits during the suppression hearing. The remaining facts are obtained from the
testimony at the suppression hearing and the statements themselves.
2. The record reflects that A.W. was living with Lindell, her grandmother.
3. The detective explained that the two of them were the only people in the building, so noise
was not a factor.
4. Miranda warnings include a statement informing the individual of the right to remain
silent, that any statement made may be used as evidence against him, that he has the right to have
an attorney present during questioning, and if he is unable to hire an attorney, he has the right to have
an attorney appointed if he cannot afford one. Miranda v. Arizona, 384 U.S. 436, 444 (1966). These
warnings are also required by Article 38.22 of the Texas Code of Criminal Procedure, except that
the statute includes an additional warning that the accused "has the right to terminate the interview
at any time[.]" Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a) (West 2005).
5. A video recording of the break room was offered into evidence at the hearing. However,
the video recording does not have any audio and merely depicts the detective and Dickerson sitting
at the table in the break room as Dickerson writes out his statement.
6. We note, however, that in his brief, in the section relating "pertinent facts," Dickerson
recites that "[t]he detectives inquired of [him] if he would be willing to come in [sic] the Sheriff's
office to provide a statement."
7. Neither Miranda nor Article 38.22 prohibits the admission of a statement that is not the
product of a custodial interrogation. Miranda, 384 U.S. at 444; Tex. Code Crim. Proc. Ann. art.
38.22, §§ 2, 5 (West 2005).
8. The record does not support a finding that the child was removed from Dickerson's custody
without his consent. The testimony of both Detective Nitsch and Dickerson reflects that law
enforcement, at the request of CPS, found a family member with whom to place C.D. during the
pending investigation. When Dickerson objected to placement with his mother-in-law, the deputies
accommodated his request to allow his mother to pick up C.D. Given the allegations of child abuse,
a reasonable person would expect CPS and law enforcement to ensure the child's safety, away from
the alleged perpetrator, pending investigation.
9. We do not find the fact that Detective Nitsch had to unlock the gate or the door to a secured
building at 2:00 a.m. in the morning to be indicative of custody. The record reflected that Dickerson
and the detective were the only people in the building at that time. A reasonable person would not
expect the Comal County Sheriff's offices to be unlocked and unsecured in the middle of the night
when no one was present in the building.
10. Because we sustain the State's fourth point of error and remand this cause for further
proceedings, we need not and do not address the State's remaining three points of error.